Argued October 30, 1963, affirmed as modified January 15, 1964

# STRAWN ET AL v. STATE TAX COMMISSION, COOS BAY TIMBER CO.

### 388 P. 2d 286

*John B. Crowell, Jr.,* Portland, argued the cause and submitted a brief for appellant.

*John M. Eaton,* District Attorney, Coquille, argued the cause and submitted a brief for respondents Strawn and Flanagan.

No appearance for State Tax Commission.

Before McALLISTER, Chief Justice, and ROSSMAN, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

## SLOAN, J.

This appeal from the tax court involves the valuation, for personal property tax purposes, of railroad equipment used by Coos Bay Timber Co. in its logging operations in Coos County. The county assessor of Coos county appraised the property as of January 1, 1960, at a valuation that caused the taxpayer to appeal to the State Tax Commission. The commission materially reduced the assessor's valuations. Pursuant to ORS 306.545 the Coos County sheriff and assessor appealed the commission's order to the tax court. The taxpayer intervened in that proceeding. The tax court did not sustain the values fixed by the assessor or the commission but found the valuation to be higher than that fixed by the commission. The taxpayer appeals.

This appeal is limited to the basis of valuation used for two types of taxpayer's equipment: skeleton log cars and diesel locomotives. In respect to the locomotives we agree with the tax court that the evidence presented was not sufficient to permit a court to set aside the valuations fixed by the assessor. We will

confine our consideration to the skeleton log cars.
The valuation made by the assessor has been aban-
doned. Our concern is, therefore, limited to the con-
flict between the tax commission's basis of valuation
and that employed by the tax court.

The statutes governing assessment of property for
the tax year 1960-61 required assessment at "true
cash value." ORS 308.232. "True cash value" was
defined to mean the "* * * amount the property
would sell for at a voluntary sale made in the ordinary
course of business, under normal conditions, * * *."
ORS 308.205(1) as it was applicable to the instant
case.

The problem of finding a satisfactory basis to find
the taxable value of these cars was unique, to say the
least. The causes of the difficulty are not hard to find.
It is known to anyone familiar with the logging in-
dustry that the use of privately operated railroad lines
for the moving of logs has almost become a thing of
the past. Several years ago many operators used this
method to haul logs. The record here reveals that
there are now only two or three private railroad log-
ging lines still in existence. One of these was, of
course, the taxpayer, Coos Bay Timber Co. It appears
that no new cars have been built for many years. The
taxpayer had maintained its rolling stock by the pur-
chase of cars from those operators who had discon-
tinued railroad logging. The purchase price of the
cars so acquired had been, for the most part, at scrap
prices. It is apparent that there is no data at all as
to the amount one of these cars "would sell for at a
voluntary sale in the ordinary course of business un-
der normal conditions." There is no market at all, for
example, in the sense that there is a market for new

or used log trucks. The taxpayer urges that the prices paid for the used log cars during the years of the 1950's provided a market price basis for finding value. Since we think the tax commission arrived at a more appropriate basis of determining value we will not dwell on this contention.

█ Some of the cars bought by the taxpayer were suitable for use after a minimum amount of reconditioning. Others were usable only for component parts. The usable parts of the latter were utilized by the taxpayer to build or rebuild usable cars. Obviously, the cost of purchase and the cost of putting the cars in usable condition varied to a material degree. The court found that the total of this cost averaged $1,100 per car for the best equipped cars. That finding has not been seriously disputed on this appeal. The real issue presented here is that the tax court refused to apply any element of depreciation to the average cost found by the court. We think the evidence would require a finding that these cars had to be rebuilt or replaced at an average time interval of seven to ten years.

In the tax court's opinion, 1 OTC Adv Sh 89, the usually recognized methods employed for finding value were examined. None of these are fully applicable to the peculiarities of this case. Much of the opinion was directed at the method used by the assessor to assess the taxable value of the cars. There is no need here to consider what the assessor did nor to examine what was said by the tax court as to other methods of finding value. The ultimate basis of the tax court's decision was stated in the following quotations from the court's opinion:

"* * * But the one feature from which this controversy actually arose is yet to be considered, the

fact that CBT could replace these cars by building cars of equal utility and worth from used components purchased at scrap sales and its own lumber and labor for much less than the assessor's true cash value. This fact was ignored by the assessor in refining his cost approach value and to this extent his application of the cost approach was in error.

## *"Principle of Substitution: Applicability*

"Because CBT could build like cars for less, the principle of substitution enters this appraisal. This principle is that a person will not pay more for an item than he must pay for a comparable (substitute) item. It is generally applied in Oregon under commission regulation Art 8205.1.3. If one would not pay more for such item, he does not value the item at a greater figure.

"The evidence shows that CBT and the few remaining logging railroads could, and regularly did, reproduce a skeleton log car by using the components purchased at scrap prices and by adding other components. These cars were equally as serviceable as those on CBT's road and at issue here. In fact, many of the ones at issue were made this way. There is a factual dispute as to this cost of reproduction but highest of the figures does not come close to the assessor's valuations of $1,500 and $1,750. If the cars can be built and substituted for very substantially less than $1,500 and $1,750, then under this principle of substitution they have no more value than the cost of substitute.

"This principle of substitution is the basic reason behind the market data approach to value. If, in the market place, a comparable (substitute) item of personal property can be purchased for less than its replacement-cost-new[*] less depreciation, then,

---

\* As a basis for attempting to find the "replacement-cost-new" the assessor relied on Rule 112 of the Association of American

assuming a true market, the market sets value. Here there is no market and no market value can be determined, but the cost of reproducing a substitute can be determined. Therefore, though the proper and usual method of determining value in this case is the cost approach of replacement-cost-new less depreciation, the cost of a substitute cannot be ignored in refining the value obtained by the cost approach.

### *"Principle of Substitution: Application*

"The commission and CBT made this same determination, but they then erred in its application. Properly, the principle of substitution reflected in market value limits the ultimate value determined by the cost approach. Instead of so applying this substituted cost, the commission, contrary to its own regulations, used this substitute cost in place of replacement-cost-new. In effect, it said cost of substitution less depreciation equals true cash value. It made this error by confusing the proper function of the principle of substitution and secondarily by giving too much weight to theoretical depreciation as opposed to actual depreciation. But most important, it made this error because it lost sight of the nature of the value being sought.

\* \* \* \* \*

---

Railroads. Rule 112 is a formula used by the railroads to fix the amount of loss sustained by a railroad when one of its cars has been destroyed when being used by another railroad. For obvious reasons, log cars were not included within the schedule of cars contained in Rule 112. The assessor used the cost of a flat car found in Rule 112 as a beginning point. He then applied his own estimate of the difference in cost between building a flat car and a log car. The assessor also failed to follow the rule as to depreciation and applied his own guess as to the amount of allowable depreciation. This resulted in the assessor's valuation stated in the court's opinion. Although the tax court approved this basis of arriving at a so-called replacement-cost-new, it was actually little more than a fictitious determination not supported by satisfactory evidence.

"* * * By very definition, used, scrap parts cannot be part of replacement-cost-new used in the cost approach. Furthermore, theoretical, as opposed to observed, depreciation cannot be applied to parts whose used price already reflects depreciation." 1 OTC Adv Sh pages 163, 164 and 165.

This is not a case in which the determination of the taxable value of a unique property should be lost in rigid adherence to the customary rules and terminology of the appraiser's art. In *Knappton Towboat Co. v. Chambers,* 1954, 202 Or 618, 628, 629, 276 P2d 425, 277 P2d 763, we quoted with approval that "* * * 'the ascertainment of value is not controlled by artificial rules. It is not a matter of formulas but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.' "

Properly, this was not a case of substitution nor was it a case for the strict application of the so-called replacement-cost-new technique. In this instance there was no actual substitution. The taxpayer used the only means possible of replacing its worn out property. By the same token there was no acceptable basis for finding the cost of a new replacement. None existed. The taxpayer, so far as this record reveals, used the only means available of acquiring this property.

If, for example, in the year 1954 when taxpayer acquired some of the used cars, there had been a supply of new cars available to the taxpayer and if the taxpayer had then bought new cars there could have been no question as to its right to arrive at a depreciated value thereof as the taxable value on January 1, 1960. We know, however, that there was no supply of new cars available in 1954 and the taxpayer used the only means available to acquire needed equip-

ment. The reality of the situation requires that the loss in value caused by wear and tear to the cars acquired or rebuilt by taxpayer in 1954, in this example, should be just as available as though taxpayer had acquired new cars. This reality was recognized by the tax commission when it examined the problem and, we think, correctly solved it by allowing depreciation.

This has been a case dependent upon analysis of facts unlike any other case we have found. No substantial questions of law have been involved. The problem of finding the true cash value of distinctive property has been the subject of previous decisions by this court. *Appeal of Kliks,* 1938, 158 Or 669, 76 P2d 974; *M & M Woodworking Co. v. Tax Com.,* 1959, 217 Or 161, 187, 188, 339 P2d 718, and cases cited in those opinions, are representative. Our duty has been to review the record *de novo.* ORS 305.445. The extent of the duty of that review has not been presented in this case. Consequently, we do not consider whether the powers of review granted to the tax court have expanded the limits of judicial review, both on trial and appeal, heretofore expressed in our decisions just cited. Our decision to accept the tax commission's assessment is within the limits previously recognized.

It is ordered that the valuation of the skeleton log trucks found by the tax commission shall be reinstated. Otherwise the decree is affirmed.

Appellant to recover costs.