## DONOVAN G. HOUGHTON ET AL, *v.*
## DEPARTMENT OF REVENUE

Donald D. Diment, Jr., Luvaas, Cobb, Richards & Fraser, Eugene, represented plaintiffs.

Richard A. Uffelman, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered July 7, 1971.

CARLISLE B. ROBERTS, Judge.

This appeal from the Department of Revenue's Opinion and Order No. VL 69-512 poses one question: What was the true cash value on January 1, 1968, of

specific real property of the plaintiffs, owned and managed by them as partners under the assumed business name of Sea Lion Caves?

The property is legally described as Government Lots 1, 2, 3 and 4 of Section 4, and Lot 5 of Section 3, in Township 17 South, Range 12 West, Willamette Meridian, and is also described as Tax Lot No. 200, Sections 3 and 4, Township 17 South, Range 12 West, Willamette Meridian, in Lane County, excepting those parts conveyed for the purposes of Highway 101. It is located on the Oregon coast, about 10 miles north of the City of Florence and includes about 98 acres. It is unique in that a large grotto or cave, about 1,500 feet long, located at the water line below spectacular cliffs, is the habitat or refuge of wild sea lions in numbers running from a few to several hundred, depending upon the season. The cliffs are the site of a great rookery of cormorants and gulls, and the cave is inhabited by a rare species of seabird, the pigeon guillemot. The property has become a well-known tourist attraction.

As of January 1, 1968, the Director of Assessment and Taxation for Lane County assessed the property as follows: land, $625,000; timber, $310; improvements (including the elevator shaft), $206,400; total, $831,710. The plaintiffs contend that the true cash value at the time was not in excess of $600,000.

The cave appears to have been discovered by a Captain Cox, a resident of the coast, in 1880. It was not accessible. The property was then in public ownership and Cox obtained a title which passed through several conveyances without the property being de-

veloped until about 1927 when it was conveyed to a Mr. Clanton who appreciated the resource and hoped to improve it for public enjoyment. By 1929 or 1930 it appeared evident that a coast highway would be built through the property and Clanton made partners of Messrs. Houghton and Jacobson. The partnership constructed trails and wooden ladders and stairs on the face of the cliff, giving access to a view of the cave to that portion of the public sufficiently agile and confident to utilize such facilities. In 1933, Mr. Clanton withdrew and Roy Saubert became a partner. He was drowned at the foot of the stairway in January 1939. Since 1952, the partnership has consisted of a son of each of the three original partners, Houghton, Jacobson and Saubert, the mother of Donovan Houghton, and the wives of the present partners Jacobson and Saubert.

Beginning in 1958, a shaft for a proposed elevator was begun, drilled vertically through 220 feet of solid rock, connecting at the foot with a tunnel roughly 10 feet in width and 10 feet high, running 70 feet to the natural cave. This was completed and the elevator began operation in June 1961. This, of course, increased tremendously the commercial potential of the tourist attraction. As of January 1, 1968, nine acres of the property could be considered as fully utilized, consisting of the main building (including a curio shop, ticket office, public accommodations), a parking space immediately in front of the building, several hundred feet of asphalt-topped paths to an observatory platform and to the elevator entrance, the elevator itself, and, across the highway, additional parking space for 100 or more cars. Of the remaining prop-

erty, about eight acres consisted of cliffs and other inaccessible areas and 81 acres of unimproved logged-over lands. There is sufficient spring water available on the property to serve the business.

The parties agree that the unique nature of the property made useless the market data and cost approaches to value, leaving only the income approach. They accept the assessor's valuations for the timber and the improvements, leaving only the value of the land (exclusive of the value of the elevator shaft, which was included in the improvements) in dispute.

■ As stated in Friedman, ed, *Encyclopedia of Real Estate Appraising* (1970 ed) 36:

> "The Income Approach to real estate evaluation is a method of estimating value, based on factual data with respect to the income yield of the property. It is a method of estimating the present worth of the benefits to be reaped from the property in the future. The method is also known as the 'capitalization approach' because the income derived from the property, generally net annual income, is reduced to an indication of value by a mathematical process or computation known as 'capitalization'."

Lacking market data, the income approach is used by a knowledgeable buyer who, having ascertained the net income attributable to the property or to comparable properties, knows the rate of return which he will require to persuade him to invest.

> "The capitalization rate to be applied to net annual income varies with time and circumstances, and is governed largely by the risk involved in ownership and operation of the particular property at a particular time. It is the rate representing a fair return on the investment. Capitalization is a

discount process, as shown in the following illustration:

> "Estimated net annual income
> from the property is .............................. $16,665
>
> "A fair return on the investment
> (capitalization rate) is ....................... 8.25%
>
> "Then if .0825 ............ equals $ 16,665
> .01     ............ equals $  2,020
> 100%   ......... equals $202,000
>
> "The indicated value of the
> property is therefore ........................ $202,000"

Friedman, *supra,* at 37.

The approach has several variations. Different techniques are utilized as conditions require. The parties agreed that a knowledgeable buyer in the present instance would have required a 15 percent return on his investment.

The plaintiffs offered, as an expert witness, Mr. Gordon Burbee of Eugene, Oregon, a real estate appraiser with 20 years of experience. His conclusions can be recapitulated as follows:

| | | | |
|---|---|---|---|
| Gross income | | $255,200 | |
| Less: Expenses | $78,665 | | |
| Management | 40,000 | 118,665 | |
| Net to land and improvements | | 136,535 | |
| 15% cap on $206,000 | | 30,900 | |
| 10% recapture on $76,000 | | 7,600 | |
| Income ascribable to land | | 98,035 | |
| Less: | | | |
| 20% coordination fee* | | 35,307 | |
| Net income to land | | 62,728 | |
| Capitalized at 15% | | | $418,000 |

---

* Coordination fee, 20% of net operating income
$255,200 — $78,665 = $176,535 × 20% = $35,307

Since there were no comparable properties on which to make an estimate of value, Mr. Burbee acted as he presumed a knowledgeable buyer would do, and made a careful study of the property and of the operation of the Sea Lion Caves. From his study of the records, he determined that the stabilized gross income from the caves was $200,000 and from the store $55,200. Total expenses attributable to the caves were $57,162 and to the store, $21,503, leaving a total net operating income of $176,535. From this he deducted $40,000 as a charge to management. The amount of the deduction was explained as follows:

"* * * This is the amount allocated to the three partners. The estimated $40,000 was arrived at by 20 percent on the gross to the caves. It was discussed with Mr. Bishop, who is in the assessor's office. Really we had no certain guide to go by. It was discussed back and forth and finally I arrived at $40,000 as not being an exorbitant amount to pay Mr. Houghton, Mr. Saubert and Mr. Jacobson for the time that they are employed there, or that they spend there. * * *"

This left a net income ascribable to both land and improvements of $136,535. It had been agreed that the assessor's value on the improvements, $206,000, was acceptable to both parties. Having in mind that this included the elevator shaft (with an accepted value of $130,000) and that the elevator shaft was not a "wasting asset," and that the depreciable assets had a remaining 10-year life, Mr. Burbee found $76,000 of depreciable property and took a depreciation for the current year of $7,600. (It is recognized by all that the purchaser who is investing wants the return of his money, as well as interest thereon. He can sell the nondepreciable assets to obtain such return but can gain back his investment in the depreciable or wasting

assets only through deduction from gross income of the sum allowable under a proper depreciation schedule.) A 15 percent return on the improvements valued at $206,000 would amount to $30,900. The total ascribable to depreciation and to return on capital, $38,500, was deducted from the net income produced by both land and improvements, $136,535, leaving net income attributable to the land only of $98,035.

Before capitalizing this remainder at 15 percent, to obtain the value of the land, Mr. Burbee deducted 20 percent of the net operating income, $35,307 (which he called "coordination") leaving a "net income residual to land" of $62,728. This amount, capitalized at 15 percent, gave $418,186, rounded to $418,000, which, added to the $206,000 ascribable to improvements, resulted in an estimated total property value of $624,000.

Mr. Burbee testified:

"* * * The next item is coordination, or 20 percent of the net operating income. This item is explained on the basis that if this land were to be leased, that anyone leasing it, hiring all of these items, all the management, and paying all these expenses, would still require profit. An example of this would be a theater owned by the Western Amusement Company. I don't imagine the principals of Western Amusement Company have been there very often. They lease the property. They [lessees] pay management. They [the lessees] pay all the expenses and they must get some return for this coordination. This I estimated to be $35,307. The balance, then, is the true net income to the land, or $62,728. * * *"

Later, as a part of his direct testimony, the record reads:

"Q Now, how—again, as to this coordination

figure, could you explain what that represents again, Mr. Burbee?

"A   Well, what I intend to show, whether it does it very well on this page or not, is that if I am to lease that property, pay all the expenses, all the management—all expenses, be that as it may, I am entitled to some profit on the basis of my coordination of the property itself, the management and the rest of it. And that is what the coordination is. It is bringing the two together.

"Q   In other words, this is the income that a lessee of the property would make—

"A   Right.

"Q   —is that correct? And the figure that you have for net income residual would be the income to the investor as the lessor of the land, would this be correct?

"A   Well, that would be the income to the owner or the lessor, yes."

In its post trial Answering Memorandum, the defendant has stated (page 3):

"A careful study of the appraisal treatises has not revealed any example in which the application of the income approach required a large capitalization rate and a management fee and a coordination fee. Nor did plaintiffs' witness cite any appraisal treatises as his authority for allocating this additional expense against property. We respectfully submit this is merely an additional item covered by the capitalization rate."

■ The court agrees with the defendant and rejects the "coordination fee" concept. Generally, in the income approach, the estimates of net income, interest rates, management fees and the like are all tempered by the market; i.e., by competition. The investor whose capital is to be used in purchasing a property seeks the highest possible return in relation to the risk of

loss he reasonably anticipates he will incur. When he leases his new acquisition to another party to operate, the owner does not thereby increase the property's margin of potential profit. Instead (a) the owner divests himself of management and must expect the gross income's payment of management to devolve upon the lessee, and (b) he decreases his own risk and to the extent of such decrease, he must bargain with the lessee as to the amount of net income, previously enjoyed by him, which must now become the reward of the lessee. It is conceivable that a change in the market at a given time, e.g., a sudden shortage of apartments brought about by condemnation of other living space, would permit the owner of apartments to lease the enterprise to a manager who could immediately increase rates without diminution of the lessor's accustomed net return. No similar situation has been shown in the present case. The plaintiffs' argument that the mere act of leasing must engender new income appears groundless. Although the unique aspects of Sea Lion Caves relieve it substantially from competition, the logic of the foregoing is applicable to it. The plaintiffs have urged the 15 percent capitalization rate, but, under their concept of coordination, they have actually decreased the anticipated true cash value of the land by reducing the income attributable to the land by $35,307 against which the capitalization rate should have been applied. This is not acceptable. (It is noted that, lacking the "coordination" adjustment, Mr. Burbee's value would closely approximate the assessor's.) All the value, including the potential lessee's value, is included in the assessment. See *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 478 P2d 393 (1970).

Defendant relied substantially upon the testimony

of Mr. James E. McHale, presently residing in Ketchi-kan, Alaska, where he is employed as a deputy assessor. Mr. McHale had had five years' experience as a fee appraiser, doing appraisals in California, Arizona and Nevada, and two years' experience with the Oregon Department of Revenue as a staff appraiser, prior to going to Alaska. He is a certified appraiser under Oregon law. His appraisal of the Sea Lion Caves, to ascertain the true cash value of the property as of January 1, 1968, was prepared in March 1970 and is detailed and thorough. (See Defendant's Exhibit I.) He agreed that the income approach was the only practicable one and that the capitalization rate of 15 percent is proper. His conclusions were:

| | |
|---|---:|
| Gross income | $369,500 |
| Less expenses | 186,045 |
| Net income | 183,455 |

Income to improvements:
   15 % interest
    4 % recapture
  2.5% taxes

| | |
|---|---:|
| 21.5% × $163,500 = | 35,150 |
| Income attributable to land | $148,305 |

15% + 2.5% taxes = 17.5%
$148,305 ÷ 17.5 = $847,450 + $20,000 rural land = $867,450 total value of land

Whereas, Mr. Burbee had found a gross income of the cave and curio shop of $255,200 (based upon a study of operating statements covering the years 1963 through 1967), Mr. McHale developed a stabilized gross income of $369,500 from a study of the partnership returns for the fiscal years 1963-64, 1964-65, 1965-66

and 1966-67 (ending October 31, 1967). Although his exhibit also showed the figures for 1967-68, he denied that he made use of them in his trending and conclusions (inasmuch as these figures would have not been known to a prospective purchaser of the property on January 1, 1968).

The larger revenue is derived from the cave, the gross income of which was $165,889 in 1963-64. This gross revenue was diminished by 10 percent the following year. The revenue for 1965-66 was 17 percent higher than the prior year and increased another 10 percent in the year 1966-67. There was a very substantial increase in the income in 1967-68, attributable in part to an increase in number of patrons but even more to an increase in the admission fees charged. However, it is difficult for the court to see how Mr. McHale would have trended to a figure as high as $369,500 without utilizing the income of 1967-68.

Curio sales have given rise to a substantial gross, beginning with $92,139 in the year 1963-64, with a decrease of less than one percent in 1964-65, an increase of nine percent or better in each of the next two years and an increase of almost nine percent in 1967-68 as compared to 1966-67. However, the cost of sales has run from $50,000 to $64,000 per year. Mr. Burbee, in Plaintiffs' Exhibit 5, has shown the store's gross income to be $55,200 and its expenses, $21,503, on the average, leaving a net operating income of $33,697. It would appear that he had excluded the cost of inventories before stating the gross income of the store to be $55,200.

Mr. McHale included in his estimate of gross income $4,500 attributable to concessions ($3,167 in 1964-65; $3,597 in 1965-66; $2,967 in 1966-67; $4,161 in 1967-68, although, according to his testimony, this last

figure was not considered in his trending). Mr. Burbee did not specify this income but it may have been included in some of his other figures.

Because of the witnesses' differences in treatment of gross income and expenses, Mr. Burbee arrived at a stabilized net operating income of $176,535 and Mr. McHale the sum of $183,455, seemingly, a difference only of $6,920. However, plaintiffs deducted $40,000 for management after this point in their schedule. Defendant's Exhibit G is so much more detailed in showing the actual figures that it carries greater weight than the income analysis shown in Plaintiffs' Exhibit 5, subject to criticism for the trending of gross income mentioned above.

Plaintiffs' expert deducted $40,000 for management; the defendant's witness deducted $29,200. The testimony would indicate that management of the enterprise is equally divided among the three male partners, Messrs. Houghton, Jacobson and Saubert. They had spent their lives in preparation for this work and were devoted to it. Evidence was offered and it seems reasonable to believe that they brought to their responsibilities of conducting or directing the affairs of the operation a special knowledge of the business, as well as contributing to the maintenance and handiwork normally required. It would be difficult to replace them. Mr. Burbee had allowed $40,000, allocated to the three partners, representing 10 percent of the gross income of the caves. Mr. McHale, for the defendant, had used eight percent of gross sales as constituting a typical management fee, based upon the analysis of other tourist-oriented business; viz., the Undersea Gardens in Newport, the Oregon Caves and the Crater Lake concession. In view of the special training and experience of the three partners, the $40,000 figure

appears to be the more acceptable. Consequently, under this view, defendant's net income of $183,455, before recapture and taxes, would be decreased by the addition of $10,800 to management, reducing net income to $172,655.

■ Having determined the net income before recapture and taxes, the next step is to set up acceptable rates to determine the capital required to produce the income expected by a knowledgeable purchaser of the property. It has already been agreed that 15 percent is required for monetary return on the expected capital. In the case of the wasting assets, some percentage must be determined on the basis of the expected useful life of the asset. In addition to these percentages, a third percentage is necessary for one item of expense which has not been included in the list of expenses considered above because the amount is unknown; that is, the taxes upon the property itself. Both parties have used a typical figure for the area, 2.5 percent. However, the plaintiffs gave a 10-year useful life to the depreciable property, requiring a 10 percent recapture rate; defendant gave a 25-year life to the wasting assets and therefore used a four percent recapture rate. Which is to be preferred?

Testimony admitted that, while at a given time there might be relatively few sea lions in the cave or adjacent to it, tourists would be attracted nevertheless, even though the maximum number at the best season did not come close to the 1,500 sea lions which had been observed in years past. There was further testimony to indicate that there had been a decline in the number of sea lions over the past several years. Although there is reason to believe that the sea lions have made this site a constantly used refuge for centuries, today's ecologically conscious world is cog-

nizant that many species of wildlife are being diminished or destroyed by man's encroachment. Radical changes in a given area can result from one oil spill. The knowledgeable investor, considering the purchase of Sea Lion Caves, can be expected to hedge his investment by a quick recovery of the wasting assets. The rate to be applied against the wasting assets, therefore, could reasonably be 27.5 percent (15 percent interest, 2.5 percent taxes, 10 percent depreciation).

It was agreed by the parties that the assessor's valuation on the "improvements" of $206,400 was correct. However, $130,000 of this amount represented the elevator shaft which, as part of the land, is not subject to depreciation. This leaves a balance of wasting assets of $76,400 which, multiplied by the factor of 27.5 percent, attributes $21,010 of the total net income to the wasting assets. Deducting the $21,010 from the total of $172,655 (net income before recapture and taxes) leaves $151,645 of income ascribable to the land itself. Capitalizing this item to give a rate of return of 15 percent on the capital plus 2.5 percent for taxes would give a land value of $866,542, including the elevator shaft value of $130,000. Adding to this the $76,400 of value in wasting improvements and $310 for timber, the result would be a total value for the property as of January 1, 1968, of $943,252.

The defendant's expert witness contended that 81 acres of the unused or inactive part of the real property was suitable for rural homesites. He testified as to 10 sales of property, located five or more miles from the subject property, sold in the years 1966 to 1969, to indicate that the 81 acres should be valued at $250 per acre for a "rounded" value of $20,000, in addition to the values placed upon the eight acres of the "active"

property. This goes far beyond anything attempted by the assessor and is rejected by the court for several reasons. First, the value per acre of the alleged comparables is so disparate that the testimony is not convincing; second, the availability of water and of drainage for sewage, necessary for building sites, remains in question; third, the need to maintain a protecting buffer of land around the site of the cave seems paramount.

On the basis of the reasoning above, it appears that the assessor's valuation of $625,000 for the land, $310 for the timber, and $206,400 for the improvements, totaling $831,710, presumably correct, is not excessive and should be approved as to amount, with the requirement that $130,000 of the "improvements" be classified as "land." The defendant's Order No. VL 69-512 is affirmed except for the classification of the elevator shaft, which must be added to "land" and removed from "improvements."