## MT. HOOD MEADOWS OREG., LTD. *v.*
## DEPARTMENT OF REVENUE

Donald R. Stark, Preston C. Hiefield, Jr. and Larry C. Hammack of Williams, Montague, Stark, Hiefield & Norville, P. C., Portland, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision remanding to defendant for necessary computations rendered May 20, 1974.

CARLISLE B. ROBERTS, Judge.

The plaintiff has appealed defendant's Order No. VL 72-358 (dated July 27, 1972), establishing the true cash value of improved real property situated in Hood River County as of the assessment dates January 1, 1970, and January 1, 1971 (Assessor's Account No. 2S 9 100, Code 9, Hood River County, Oregon). The property consists of leased federal Forest Service lands and the improvements thereon comprising the Mt. Hood Meadows Ski Resort.

The plaintiff is a limited partnership with Mt. Hood Meadows Development Company (a corporation formed in 1966) as its general partner. The general partner is a subsidiary of the Drake Investment Company which, in turn, is a subsidiary of Donald M. Drake Company, an Oregon corporation, with a long history in the construction industry. As of the years in question, the plaintiff had 18 limited partners, individuals who had invested from $25,000 to $100,000, each, in the enterprise. The limited partnership has maintained its financial records on a fiscal year basis, the year ending on October 31.

The genesis of Mt. Hood Meadows is found in the issuance by the U. S. Department of Agriculture's Forest Service in July 1965, of an "Operator's Prospectus, Hood River Meadows Winter Sports Development, Mt. Hood National Forest, Oregon." This prospectus invited proposals to the Forest Supervisor of the Mt. Hood National Forest for the development and operation of a commercial winter sports enterprise. Mr. Franklin G. Drake of Portland, Oregon, a trained engineer and contractor, an officer of Donald M. Drake Company, an Oregon corporation, with a long history in major construction enterprises, and a

skier since boyhood, became interested in the prospectus and, after study, organized the plaintiff for the purpose of bidding on the project. Mr. Drake made a personal examination of the site and found it located within the Mt. Hood recreation area on the east side of Mt. Hood, west of the Mt. Hood Loop Highway, on the dividing ridge between Hood River and White River. The area is accessible from the Mt. Hood Loop Highway from Portland via Highway 26 (approximately 67 miles) or via Interstate 80N (approximately 96 miles).

In January 1966, the plaintiff was designated by the Forest Service as the successful applicant to develop and manage the proposed ski area but the expected time scheme for development was hindered until June 1966 by a competitor's contest of the bid, closely followed by a fire stoppage which threw construction work plans askew, voiding much of the short summer construction season and making it necessary to do Phase I work under unfavorable conditions of wind, snow and low temperature.

On July 19, 1966, the Forest Service issued to the plaintiff its Term Special Use Permit No. 2710 for 80 acres for 30 years, followed on September 8, 1967, by a Special Use Permit No. 2720, renewable each year, for 3,100 acres surrounding the base operating area described in the first permit.

As required by its contract, plaintiff began to improve the premises to develop a day ski area. In 1967, a T-bar installation (designed to seat two persons side by side, wearing skis) was installed; a parking lot of approximately eight acres was leveled and paved with asphalt, providing room for 800 to 850 automobiles. In 1967, a maintenance building was com-

pleted (a small addition being added in 1969). This building is of heavy wood frame construction, with four overhead doors, a foundation measuring approximately 40 by 120 feet, providing maintenance and storage area for the equipment, maintenance office and restroom, and the standby power system for the shop and T-bar.

A day lodge was located at the northwest end of the parking lot, with overall dimensions of 66 by 97 feet, plus a lobby. It is constructed of concrete and heavy wood beams, with three stories, containing a lobby, first-aid room, administration offices, ski shop, mechanical room, restrooms and storage areas, ski school equipment room, kitchen, cafeteria, bar and dining room, overnight quarters for staff, laundry room and storage. (The Forest Service has not allowed public overnight accommodations, although often requested.)

Chair lift No. 1 and chair lift No. 2 were basically constructed during the latter portion of 1967 and placed in use in January 1968. Chair lift No. 3 was constructed during the summer of 1969 and placed in use at the beginning of the ski season in 1969. Rope tows Nos. 1, 2 and 3 were constructed through 1967 to 1969 and were in use at the beginning of the 1969-1970 season. These were in addition to the T-bar constructed during the latter part of 1967 and placed in use as of January 1968.

Other site improvements included a water system and sewage treatment plant constructed during the latter part of 1967 (under extremely poor weather conditions, resulting in cost overruns). In 1969, there was considerable erosion control and additional landscaping and improvement of the parking lot paving.

The Phase I work was completed prior to opening the area and the project was opened to the public in late January or early February 1968. The development plans were slowed by the fact that the National Environmental Quality Act became effective on January 1, 1969 (delaying the building of one lift for a period of three years).

As stated in *Encyclopedia of Real Estate Appraising* 3, ch 1 (Friedman ed, rev & enlarged ed 1970):

"The transactions in which appraisals are needed have become increasingly varied. Most common are appraisals for a prospective purchase or sale, a long-term loan secured by real estate, insurance, imposition of a tax, and the taking of property by a governmental agency under the right of eminent domain for public or quasi-public use. In each of these transactions, it is assumed that the appraiser is specially equipped to form a sound judgment as to the various uses to which the property may be put and its probable worth in money or in exchange, and that he has no personal interest in the property. The appraiser is not expected to estimate the *exact* value of any given property on any particular date, since no one is capable of such a feat or could *prove* the absolute accuracy of his estimate if he thought himself so capable.
\* \* \*"

The problem confronting the parties and the court is to establish, *for tax purposes,* the true cash value of the land leased by the plaintiff from the Forest Service and the improvements thereon as of the assessment dates, January 1, 1970, and January 1, 1971 (ORS 308.205; R308.205-(A); OAR 150-308.205-(A)). The appraiser finds an unaccustomed difficulty in that, under ORS 307.060, the property of the United States held by the plaintiff under a lease interest or other

interest less than a fee must be assessed and taxed "as for the full true cash value thereof subject only to deduction for restricted use." See *R.L.K. and Co. v. Tax Commission,* 249 Or 603, 438 P2d 985 (1968).

In the midst of difficulty, it is useful to review fundamentals.

"For many years, it has been accepted appraisal practice to use three separate approaches to real estate value, commonly known as the Market Approach, Income Approach, and Cost Approach. * * *" (*Encyclopedia of Real Estate Appraising, supra,* at 10.)

In Oregon, the market data approach must be used if possible. (*Portland Canning Co. v. Tax Com.,* 241 Or 109, 404 P2d 236 (1965).) The income approach is particularly useful where comparable sales are unavailable or suspect and a "market" for investment money can be ascertained and basic operating income and expense data are available. The cost approach is based upon an estimated reproduction or replacement cost of improvements new, less estimated accrued depreciation, plus estimated land value. Except where the appraiser has no other choice, the cost approach is generally applied only as a check on estimates of value by other approaches.

"* * * It is said that the estimate obtained by the Cost Approach tends to set the upper limit of value. This simply means that, as a rule, a buyer will not pay more for an existing piece of property than it would cost him to build a similar property. Surrounding conditions must, however, be taken into account. An existing property ready for use or leased to a responsible long-term tenant at a fair rental may be worth more to a prospective buyer than one which has to be constructed in the future.

"An estimate obtained by the Cost Approach

may not reflect entirely the prevailing economic or market conditions. The cost of an improvement cannot be recovered in the market if there is no need for the improvement, if the property is not put to its highest and best use, if the structure is an overimprovement or of poor design, or if rentals are reduced due to economic conditions.

"The cost of a project is an essential factor in appraisal, but in estimating value the appraiser should also apply the Market Approach, if possible. He should ascertain what others are paying for similar property, whether current rentals justify the project at a particular time, whether a proposed project is justified in view of local and national conditions.

"The Cost Approach to value is particularly limited in estimating the value of an estate or expensive mansion-type property where, within a short time, a high percentage of the cost may not be recoverable." (*Encyclopedia of Real Estate Appraising, supra,* ch 4, at 67.)

It is easy to quote property appraisal textbooks and treatises, but the realities which confront the property appraiser are multitudinous. An exhausting pursuit of data may reveal little of value. It is natural for interested persons to conceal or distort indispensable information. It is recognized that, in consequence, appraisers' valuations purporting to reflect "the market" are necessarily highly subjective.

Worse still, the essential data for an approach to value may not be available to anyone. This is true in the present suit in which the testimony reveals that all the parties and their appraisers exchanged information freely and candidly and that professional ethics were most scrupulously observed. Three expert appraisers testified, each bringing a different background and experience to the problems, but the

testimony reveals the almost insurmountable task undertaken by them.

The testimony is undisputed that the ski area industry is a high risk investment by the very nature of its major peculiarities, a combination of location, terrain, weather, operating schedules, and the fact of government ownership of the land. The industry is still in its early stages and dependable data relating to it are unavailable.*

In consequence of its infancy, the industry is one which is rapidly changing as experience dictates new safety requirements and customers' expectations are enlarged. Risks readily assumed in other undertakings can be calamitous in this one, the chief being the weather factor which may make a season outstanding or ruinous. The court has been impressed by the statement of one of the plaintiff's expert appraisers (who has specialized in studies of ski areas for purposes of investment):

"*Weather:* Weather has a very far-reaching effect on ski areas. It provides a short building season. It increases costs due to delays, mud conditions, freezing temperatures, and often impossible working conditions.

"Snow loads make it important to design for excessive weight and snow creep. Low tempera-

---

* The chief compilation put into evidence is entitled *Economic Analysis of North American Ski Areas,* December 1972, published jointly by the National Ski Association and the United Bank of Denver National Association. This information was developed to assist ski area owners and managers in measuring their area's performance against that of others and to allow investors to get a better picture of the industry's financial performance during the 1971-1972 season. However, out of 435 National Ski Area Association members, only 83 responded, a sample of 19.1 percent. It is an initial effort, chiefly useful in illustrating the information which may be obtainable in the future if the membership cooperates.

tures require special insulation, heated or double roofs, protected plumbing, and increased heating for buildings.

"Power failures happen more frequently in the mountains, due to blowdowns and icing on the lines. Costly standby equipment is necessary, but often inadequate to prevent heavy losses of patronage.

"Communication services are often disrupted in the mountains, creating problems of operation.

"Water and sewer systems often fail, due to severe weather, and repairs in winter conditions are slow and costly.

"Weather has a direct effect on ski area attendance and success. The ski area is at the mercy of weather in the resort, on the access routes, and in the communities from which the skiers come.

"Temperatures and precipitation in the ski area must combine to produce an adequate amount of snow every winter for operations. Hopefully, there must be sufficient snow for four to six months of operation each winter to provide revenues to cover the annual fixed and variable costs.

"Together with this requirement for adequate snow every winter, and throughout the winter, it is important—or imperative—that weather conditions in general are reasonably favorable on a relatively few key days during the winter when peak attendance can be expected.

"Many ski areas which are not destination resorts rely upon approximately 40 weekend days and 10 to 15 vacation days for 50% to 75% of their total gross revenues. This applies to nearly all ski areas in Western North America. Ski areas very close to large population centers will experience more mid-week and night skiing, and are not as dependent on the 50 to 65 days more remote areas are.

"Unfavorable weather in the ski area can reduce attendance because of storms, extreme winds, very low temperatures, rain, whiteouts, and un-

skiable snow conditions. The latter includes icy, crusty, deep or heavy snow. Fortunately, snow grooming equipment can convert most unfavorable snow conditions into good or acceptable snow surfaces. The public has come to expect this snow grooming in today's ski areas.

"On some occasions, weather and snow conditions in the ski area are good or excellent and attendance is reduced or practically eliminated by unfavorable driving conditions along the access route. Ice and snow covered roads might be so widespread the equipment for plowing and sanding cannot adequately do the job. Some areas suffer closures due to avalanches along the access route. Some areas have experienced rather extensive closure periods when bridges have failed along the access route. The prospects of putting on tire chains will discourage some skiers from coming to the mountains.

"A third hazard of weather for the ski area is excessive snow in the communities from which the skiers come. Very often, people will not venture to the mountains to ski if they have problems of driving in their own city, due to snow and ice-covered streets." (Pl Exh 1, at 30-32; footnote citations omitted.)

Forest Service studies indicate that the ski season on Mt. Hood comprises 150 days, of which 68 may be regarded as "high usage days."

These considerations are important to the court's decision in the present suit. As a demonstration that difficulties are presented to the appraisers, it is noted that the total cash value of the property as of January 1, 1970, as asserted by the county was $1,062,420; as determined by the Department of Revenue, $1,150,-000; as urged by plaintiff's first expert appraiser, $665,000; as urged by plaintiff's second expert appraiser, $751,186; and as urged by defendant's expert

appraiser at the trial, $922,000. The values asserted as of January 1, 1971, by these same authorities are $1,153,700; $1,375,000; $900,000, $1,048,704; and $1,-152,000, respectively. (The method used by Hood River County in valuing the land only as of January 1, 1970, $35,650, and for January 1, 1971, $95,580, is not made clear in the testimony. The cost approach was used for the improvements.)

The parties and their expert witnesses agree that the land here involved can be treated as if owned in fee, in view of plaintiff's substantial possessory rights to utilize the property for the production of income and because of Forest Service policies which protect and encourage the maintenance and increase of the heavy investment which is necessary for ski area projects where the standards of the Forest Service are observed. (This was the undisputed testimony of witnesses for both parties and is relied on by the court.)

The parties and their expert witnesses were in complete agreement that the market data approach could not be used to indicate value, inasmuch as ski areas are rarely sold and the two or three sales which were found on the Pacific Coast in recent years were definitely distress sales. The testimony is conclusive that there is a very limited "market" for ski areas.

The three professional fee appraisers (two testifying on behalf of the plaintiff, one for the defendant) used the income approach. As stated in the defendant's Order No. VL 72-358, at 2:

> "The property was appraised by professional fee appraisers for both parties. They agree that the income approach is the proper method for valuing the subject property, no doubt because it is

an income-producing property and also for the reason that the use of that method would automatically provide for deductions for restricted use as required by ORS 307.060 [with respect to land leased from the federal government]. The income flows from the use made of the property and no deduction therefore need be made.

"The appraisers differed greatly in their methods of arriving at the income to capitalize and arrive at the value of the subject property. * * *"

The court has diligently studied the written appraisal reports and reviewed the testimony of each of the fee appraisers and noted admiringly the ingenuity and imagination demonstrated in each. Also noted was the appraiser's latent uncertainty and high degree of speculation (for lack of facts) in each appraisal.

Properly used, the income approach requires a great deal of accurate data, including comparisons with competitors (a valuable aid in ascertaining the market). It was impossible for the witnesses to obtain such data because of the vast differences between each of the Pacific Northwest ski areas, the infancy of the business and, particularly in this case, because of the immaturity of the project, in spite of the cooperation and openness of the plaintiff in revealing its records. The subject property had incurred losses in each of the two fiscal years ending on October 31, after the assessment dates; in 1970, $107,186; in 1971, $21,-704 (given in the testimony as an estimate). (The third ski lift was in use just a month prior to January 1, 1970, and its effect for the tax year 1970-1971 was unknown to the assessor as of the assessment date January 1, 1970.)

At a late date, it was discovered that the feasibility report on which the plaintiff had relied was based

upon Forest Service figures which did not distinguish between skiers and nonskiers and included summer visitors; consequently, important projections based upon such data were found to be unreliable. In short, the income approach, which calls for a firm, definite, accurate measure of the market and typical earnings over a minimum period of four to five years was of no more use than the market data approach in this case.

A comparable situation confronted the court in *Shields et al v. Dept. of Rev.,* 5 OTR 160 (1972) (*aff'd* as to use of cost approach in 266 Or 461, 513 P2d 784 (1973)). In that case this court stated, at 165-166:

> "The income approach (an extremely useful tool in the proper situation) requires substantial amounts of particularized, verified data. Gross errors can result if such data are not available. [Citations.] It was impossible for the defendant to obtain the necessary information on which to base an income approach at the required time for assessment purposes in this instance. Since the Valley River Center was unique, the assessor could not obtain data of economic rentals through other local sources, as was possible in the case of *Multnomah County v. Dept. of Rev.,* 4 OTR 383 (1971), * * * ."

The same situation obtains here. As of January 1, 1970, the earnings history was scant. There had been only two years of limited operation, at a loss in each year, and, in consequence, there was lacking that maturity which is essential to supply data with which the complex income approach can be supported. Two of the expert witnesses, therefore, projected a future year as the year of maturity and worked back therefrom. As one of plaintiff's expert witnesses admitted,

"* * * It is important to note that expenses must stabilize" in order to use the income approach. The court has already noted that in his appraisal report and in his testimony, each of the three appraisers revealed his uneasiness in utilizing the income approach with little or no income history available for the subject property or to be found in market comparables (which were nonexistent).

Since the court rejects the income approach for the property as a whole, an evaluation of the variances in approaches used by the expert appraisers is omitted from this decision but, in the view of the court, they were subject to criticism. See the decision rendered this day in *Mt. Bachelor, Inc. and Mt. Bachelor Lodging, Inc. v. Dept. of Rev.,* 5 OTR 526 (1974).

The fee appraisers rejected the cost approach for reasons which are not convincing to this court. One fee appraiser preferred the income approach because of the ease with which both economic and functional obsolescence could be determined therefrom, but the same appraiser had to speculate constantly as to the data on which the income flow was based. The second fee appraiser testified that there was no necessary relationship between total investment and its actual productivity or profitability as shown by costs (and this is certainly true) but this same appraiser testified on behalf of the plaintiff that costs at Mt. Hood Meadows (apart from estimate overruns due to bad weather) were "quite typical."

These arguments in opposition to the cost approach are not dismissed lightly by the court; however, there appears to be no other recourse as to the real prop-

erty improvements for the years in issue. County assessors must make annual appraisals; the purpose of the appraisal is for tax purposes; the market value is determined by the willing seller-willing buyer concept. "Knowledgeable" sellers and buyers, lacking comparable sales and lacking accurate market data on which to determine income, may utilize the highly speculative method advanced by one of the fee appraisers, testifying for plaintiff, in which the "date of maturity of the income production" for the subject property is reached and then discounted back to the assessment date in question, but this method cannot be commended to any county assessor.

It is noted that at the time preparations were being made for the presentation of evidence in the present suit, the Supreme Court had not released its decision in the *Shields* case, *supra*. It was handed down shortly before the trial of this case and, in consequence, counsel for the defendant sought to place in evidence some testimony in utilization of the cost approach. The testimony shows and the court finds that the cost figures are readily available but (1) should be discounted by the cost overruns due to inclement weather conditions which the plaintiff had to suffer and because of delays for which the lessor was responsible, and (2) should be subject to heavy and rapid depreciation (because of the undisputed testimony as to great physical depreciation and economic obsolescence suffered by ski area improvements). In addition, the subject property could be found to be over-improved in its first years, having greater capacity than could be utilized, built for reasons of long-range economy.

The court concludes that the cost approach is the only one available for use by the county assessor and

the Department of Revenue as to real property improvements in the state of the facts revealed by the testimony. *Shields et al, supra.*

■ The only available approach for valuing the land leased from the Forest Service is to capitalize the annual fees paid by the lessee as income imputable to the land. This is justified because of the agreement of two of the expert witnesses that the fees charged for use of ski areas by the Forest Service are intended to and do equal economic rent. This method, happily, automatically recognizes the effect of restricted use of the land which diminishes the value of the fee, as required by ORS 307.060.

■ In this case, in determining the capital rate to be applied to the "income" from the land, consideration must be given to the relation between debt and equity ownership as it actually existed for the subject property on January 1, 1970, and January 1, 1971. The interest rate actually paid by plaintiff on its borrowing should be used in this instance, multiplied by the percentage of debt in the debt-equity ratio. The reasonable return on the plaintiff's investment is found, by the preponderance of the evidence, to be 25 percent, which should be multiplied by the percentage of equity in the debt-equity ratio. To the percentages thus found must be added the percentage representing the tax rate in the Hood River County code area in which the subject property is situated, the total representing the overall capitalization rate.

The court anticipates the questions which will be raised by qualified appraisers by the utilization of two approaches for what is regarded as one property, and for using actual amounts for purposes of calculations instead of amounts found by a study of the

"market." It is believed the answers to these questions will be readily apparent to anyone who peruses the record in this case, constantly holding in mind that the aim of this exercise is to establish a method of property valuation to be used by a county assessor for purposes of taxation of a particular example of a unique enterprise which can barely be considered an "industry" in the customary sense, where the particular enterprise has too short a history to have established an income stream, and where the facts relating to competitors are too varied and diverse to serve as guidelines. As was said in *Strawn v. State Tax Com.*, 236 Or 299, 305, 388 P2d 286 (1964), and repeated in *R.L.K. and Co. v. Commission,* 1 OTR 584, 598 (1964): "This is not a case in which the determination of the taxable value of a unique property should be lost in rigid adherence to the customary rules and terminology of the appraiser's art. * * *"

By this decision, the cause is remanded to the defendant to make the necessary inquiries and study and to submit to the court and to the plaintiff its computation pursuant to the court's determination of the issues as set out above. The parties shall attempt to agree on such computation of true cash value for each of the years in question, but if they are unable to do so, the plaintiff may serve and file a computation believed to be in accord with the court's decision. The court may then require briefs or oral arguments before deciding on the proper computation and prior to the issuance of its decree. See Tax Court Rule 26.