## MT. BACHELOR, INC. and MT. BACHELOR LODGING, INC. *v.* DEPARTMENT OF REVENUE

R. L. Marceau, Panner, Johnson, Marceau & Karnopp, Bend, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision remanding to defendant for necessary computations rendered May 20, 1974.

CARLISLE B. ROBERTS, Judge.

The plaintiff, Mt. Bachelor, Inc., an Oregon corporation, appealed from the defendant's Order No. VL 72-201, establishing the true cash value of certain real property for the tax year 1970-1971, and from defendant's Order No. VL 72-202, separately setting the true cash value of a part of the same property for the 1971-1972 tax year. The second plaintiff, Mt. Bachelor Lodging, Inc., an Oregon corporation and a subsidiary of Mt. Bachelor, Inc., appealed from defendant's Order No. VL 72-203, relating to the assessment of the remainder of the real property for the

1971-1972 tax year. (The property owned by Mt. Bachelor Lodging, Inc., consists of an overnight lodge and a lease from the U. S. Forest Service of the land on which it lies in the Mt. Bachelor ski area. The same property was included in the property of Mt. Bachelor, Inc., for the 1970-1971 tax year.) All the appeals were consolidated into one complaint for purposes of trial. For 1970-1971, the whole property was placed on the assessment roll as Assessor's Account No. 189100A1, Code 1-2; for 1971-1972, the property of Mt. Bachelor, Inc., was designated as Assessor's Account No. 18900A1, Code 1-2, and the property of Mt. Bachelor Lodging, Inc., was listed as Assessor's Account No. 189100A2, Code 1-2.

The land involved is owned by the U. S. Forest Service and lies on the slopes of Mt. Bachelor, in Deschutes County, Oregon, being described in the Forest Service Special Use Permit No. 2710, awarded to Mt. Bachelor, Inc., on August 18, 1958, and revised November 8, 1963, as follows: Bachelor Butte Winter Sports Area, lying within T 18 S, R 9 E, WM, as follows: Sec 19, E ½ E ½ SE ¼, 40 acres; Sec 20, S ½, S ½ NW ¼, NE ¼ NW ¼, S ½ S ½ SE ¼ NE ¼, W ½ SW¼ NE ¼, SE ¼ SW ¼ NE ¼, 480 acres; Sec 29, N ½, N ½ SW ¼, SW ¼ SW ¼, N ½ NW ¼ SE ¼, 460 acres; and Sec 30, E ½ E ½ NE ¼, 40 acres.

The permit, covering approximately 1,020 acres, was issued to the plaintiffs for the purpose of constructing, operating and maintaining a winter sports area, including the necessary rope tows and ski lifts, an overnight lodge, a restaurant, utility buildings and parking areas, and such other improvements as might be approved in writing by the Forest Service.

In each of its three orders, the defendant relates that the plaintiffs had alleged that the only proper way to value the subject property for assessment purposes was by the income approach, that the assessed value was based upon an appraisal made by the county assessor using a depreciated replacement cost approach with respect to the improvements, and that the record does not contain sufficient evidence to establish a value for the improvements through the use of an income approach to value. The assessor's value was affirmed in each instance. On appeal to this court, the plaintiffs alleged that the valuation method used was improper and that the true cash value of the plaintiffs' real property as of January 1, 1970, was $641,009 and, as of January 1, 1971, was $692,483.

At the trial, all parties agreed that the land leased from the Forest Service was subject to taxation as though owned in fee, subject only to deduction for restricted use. *Ore. Summer Hm. Owners v. Johnson,* 265 Or 544, 510 P2d 344 (1973); *Mt. Hood Meadows, Oreg., Ltd. v. Dept. of Rev.,* 5 OTR 542 (1974) (a case argued in conjunction with the subject case and decided this day). The parties also agreed that the income approach to valuation was appropriate in this case and the cost approach was not appropriate. The market data approach could not be used because comparable sales were completely lacking.

The court agrees that the income approach must be used in this instance. *Houghton v. Dept. of Rev.,* 4 OTR 451 (1971) (*aff'd,* 261 Or 564, 495 P2d 715 (1972)). The subject property has a sufficient history of income production to be within the requirements of

the income approach. *Cf. Shields v. Dept. of Rev.,* 266 Or 461, 513 P2d 784 (1973), and *Mt. Hood Meadows, Oreg., Ltd., supra.* Happily, the income approach automatically takes into account any restrictions in the use of the leased property.

The plaintiffs were first issued a Forest Service permit in 1958 and the first operational year of the ski area was 1958-1959. The initial facilities included a 3,000-foot Poma lift and two rope tows. Chair lift No. 1 was placed in operation in 1961, No. 2 in 1963, No. 3 in 1966, and No. 4 was installed in the summer of 1970. Although preceded by one or two other Oregon ski areas, the plaintiffs must be considered among the pioneers in ski area operation, at least as far as Oregon is concerned. They have seen much change and experienced many trials.

As has been stated, both the plaintiffs and the defendant independently determined that the income approach to value is the best method for valuing the property for tax purposes in this suit and the court agrees. However, the income approach has a number of variations and vast opportunity for subjective judgments. Not only does the approach require a substantial amount of accurate data but the appraiser's conclusions, such as the overall capitalization rate to be used, must be developed with the utmost care. *Nepom v. Dept. of Revenue,* 4 OTR 531, 532 (1971); *Houghton v. Dept. of Rev., supra,* at 454; *Feves v. Dept. of Revenue,* 4 OTR 302, 304 (1971).

Both plaintiffs and defendant utilized the services of expert fee appraisers. Each expert varied considerably from the other in his detailed use of the income

approach, the plaintiffs' expert particularly offering much that was novel.

In the American Institute of Real Estate Appraisers, *Appraisal Terminology and Handbook* 105 (5th ed 1967), the "income approach" is defined as:

> "An appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income. The capital amount, called the capitalized value, is, in effect, the sum of the anticipated annual rents less the loss of interest until the time of collection. The reliability of this technique is dependent upon four conditions: (a) the reasonableness of the estimate of the anticipated net annual incomes; (b) the duration of the net annual income, usually the economic life of the building; (c) the capitalization (discount rate); and (d) the method of conversion (income to capital)."

As stated by C. Hollebaugh, *Income Approach to Value,* in *Encyclopedia of Real Estate Appraising* 36 (Friedman ed, rev & enlarged ed 1970), at 38:

> "Regardless of the technique used for processing income into value, the appraiser should gather the following specific information with respect to the property being appraised, and the following general information bearing on its value:
>
> "* * * * *."

The writer lists six categories as follows:

First, "[c]urrent annual income of the property being appraised," and, second, "[a]nnual recurring expenses of the property being appraised." The plaintiffs opened their records in these respects in a most commendable way to defendant's expert witness as well as to plaintiffs'. However, the skiing season begins in November and typically ends the first part of May.

The plaintiffs, accordingly, use a fiscal year ending July 31. Neither expert annualized plaintiffs' income and expenses. For the assessment date of January 1, 1970, plaintiffs' expert used the fiscal year ending July 31, 1969. For the same assessment date, defendant's expert used the fiscal year ending six months after the assessment date, July 31, 1970.

Third, the appraiser should ascertain the " '[g]oing' unit rentals received from like or similar use units in comparable properties — that is, rental per square foot per month or per year for apartments, office space, and so forth." The reason for this rule, of course, is to discover the "market," avoiding complete reliance upon the operation of the subject property which may be substantially different from the market for one or several reasons, such as management, location, amenities, and the like. However, there are no leased ski areas (apart from the leased governmental land) and the myriad differences between one area and another are substantial.

Fourth, the appraiser must find "[*t*]*ypical* expenses of *comparable* local properties, such as property management, fire and other insurance, maintenance and repair." (Emphasis added.) This was virtually impossible in the present instance because of the short history and infrequent occurrence of ski areas. An *Economic Analysis of the Skiing Industry,* prepared in 1971 by the National Ski Areas Association and United Bank of Denver National Association, was an attempt to ascertain "typical expenses" but the court has concluded that no reliance should be placed upon it (as is discussed elsewhere herein). See *Mt. Hood Meadows, Oreg., Ltd., supra.*

Fifth, "[s]ales of properties in the area comparable as to land, use, size, shape, condition, annual income, and actual sales price." Since no comparable sales of ski areas are available and the land itself is owned by the federal government, this requirement imposes an impossibility in this case, as was clearly shown by the testimony.

Sixth, "[c]urrent local financing conditions, percentages of loans to market value, interest rates on mortgages, and discounts required on mortgage paper." Such information was offered in testimony, although there was some conflict, requiring the court to choose the evidence supported by a preponderance.

Eloquent and convincing testimony was presented to prove, and the court finds, that at this time each ski area is a unique property. It follows that comparable data from other areas, as a check on the "market" for the use of the income approach, are not available. Also, note must be taken that almost every ski area is developed by skiing enthusiasts, for their own benefit and that of fellow skiers. Consequently, the usual rules of profit making are actually of secondary consideration. This is another factor adding difficulty to the evaluation of such property, using formulae based on practices common in other markets. In consequence, a great part of the data used in the income approach can be developed only from the history of the subject property.

Plaintiffs' expert witness was presented as a man "thoroughly familiar with every phase of the ski area industry — from their promotion to their operation and, most particularly, their valuation." The court was impressed by plaintiffs' expert witness' credentials

and presentation but it must always be held in mind that he is an expert in an infant industry. The expert's own testimony strongly urged the concept that it is not really an "industry." Ski areas are almost invariably developed by enthusiastic skiers who seek an opportunity for their own enjoyment and for the skiing public as a matter of goodwill rather than of profit.

Plaintiffs' expert, schooled in accounting and economics, was formerly a treasurer and manager of an important ski area in another state and has gone on from this experience to engage in a consulting practice specializing in ski area properties, setting up "master plans" for newly projected and older areas and advising potential investors. Actually, his work as an appraiser has been minimal (he admits that it has not been a "big part" of his work) and in only one instance (apart from his appearances in this suit and in the *Mt. Hood Meadows, Oreg., Ltd.,* case, *supra*) was his appraisal related to taxation.

Although there is no doubt that plaintiffs' expert witness has made a careful study of the income approach to value for appraisal purposes (not necessarily for tax purposes), his method includes novel variations which require careful evaluation.

Plaintiffs' expert appraised the properties of Mt. Bachelor, Inc., as a total productive unit in a going business. The raw land, the improvements thereon, the personal property, and the "working capital" were all conceived as contributing to the income stream. The purpose of the appraisal was to determine the value for the purposes of taxation of the land itself and of

the improvements. The value placed upon the personal property by the assessor was assumed to be correct.

Plaintiffs' expert very clearly outlined his concept of the income approach to value, beginning with gross income from operations, without deduction for depreciation, interest expense, property taxes, income taxes, or the Forest Service *permit fee,* but deducting the "going rate" for management and other normal operating expenses plus a "return to working capital" and a "provision [seven percent of gross income] for capital expenditures." He testified that this resulted in a figure of income imputable to the total property, which must be capitalized at an acceptable rate to determine the amount of capital which could be properly invested in the total property on account of its earning ability. Since the total property thus had been taken into consideration by him, in his view of its separate contributions to the income stream, it was necessary to make an allocation of the capital amount thus discovered to the land, to the personal property, and to the improvements.

In working out his formula, plaintiffs' expert relied heavily upon the Property Tax Rules and Regulations, ch 1, subchapter 1, rule No. 8, "The Income Approach to Value," of the State of California's Board of Equalization (Property Tax Department), effective January 18, 1968, relating to Cal Rev and Tax Code § 110.

Plaintiffs' expert, as a former manager of a ski area and a drafter of master plans for such areas, has developed a concept of the "full potential earning ability" of a given ski area. Based upon his projections, he undertook to determine the year in which the area

under study would produce the optimum income, considering the available physical resources and improvements, and, having formulated the hypothetical income stream to be received in the year of full earnings, he then discounted the estimated full potential capitalized earnings to a present value, using a "present worth of one interest table." He then added the present value of the interim income to the present value of the full potential capitalized earnings to find current value. (Other aspects of the calculations of plaintiffs' expert are considered below.)

Both plaintiffs' expert witness and defendant's expert agreed that the fees charged by the Forest Service for the use of the land represented economic rent and, accordingly, its valuation could be determined by ascertaining the proper rate of capitalization under the income approach.

The county assessor, using the cost approach, had determined that the January 1, 1970, values were: land $45,750; improvements $842,750; personal property $93,731; a total of $982,231. Plaintiffs' expert testified that the values as determined by the income approach should be: land $50,089; improvements $590,920; personal property $93,778; total $734,787. As of the assessment date of January 1, 1971, the county assessor had assessed the property of both plaintiffs (the same property held by one plaintiff in the prior year), as follows: land $45,750; improvements $1,252,750; personal property $116,101; totaling $1,414,601. The plaintiffs' expert testified that the true cash value for that year should be: interest in land $59,879; improvements to land $632,604; personal property $116,101; totaling $808,584.

The defendant's expert was more conventional in his use of the income approach. He, too, benefited by the taxpayers' cooperation in making available necessary data relating to gross income and operating expenses and depreciation schedules. As mentioned above, he used the records of the taxpayers for the 1969-1970 fiscal year to ascertain the true cash value for the assessment date of January 1, 1970, and the fiscal year 1970-1971 for the assessment date January 1, 1971, thus obtaining the advantage of six months of hindsight each year which is ordinarily denied to the county assessor.

The defendant's witness utilized all the elements of the operation which developed income and deducted all operating expenses (including the lease fee paid to the Forest Service as an operating expense, contrary to the practice of the plaintiffs' expert). He followed the same approach as the plaintiffs in eliminating real and personal property taxes from operating expenses (making adjustment therefor in the overall capitalization rate) and increased the amount of the deductions by enlarging the amount for management to meet what he deemed to be the competitive market. For reasons not made clear in the testimony, he felt compelled to use a formula to allocate the total depreciation utilized by the taxpayers to categories of real and personal property on an arbitrary basis, concluding that 90 percent of depreciation should be allocated to real property improvements and 10 percent to personal property.

In formulating his rate of capitalization, he followed the generally accepted view that an investor seeks (1) to use income to recapture the amount expended in wasting assets within a reasonable period;

(2) to use income to amortize indebtedness and payment of interest thereon; (3) to obtain a reasonable return of income measured by the investor's equity.

For purposes of recapture, he deemed that the 90 percent of the property value allocable to real property improvements would have an average remaining economic life of 15 years, requiring 6.67 percent recovery per year; the 10 percent allocable to personal property would have an average remaining economic life of five years, requiring 20 percent recovery per annum; this led to an overall recapture rate of 8 percent.

Based upon his substantial personal experience in the local (Oregon) money market, defendant's expert determined that a buyer of the property could expect to obtain a loan of 70 percent of the overall value at 8.5 percent, amortizable over a period of 15 years. Seventy percent times 8.5 percent would equal 5.95 percent, and 30 percent times 20 percent (deemed by the witness as an investor's required return on his equity) would equal 6 percent, which totals 11.95 percent, to be placed in the capitalization rate for retirement of the indebtedness and return to equity.

The applicable tax code rate, as shown by the assessor's records, indicated $22.80 per one thousand dollars of property value, requiring that 2.3 percent be added to the 8 percent recapture rate and the 11.95 percent return on invested capital to reach the overall capitalization rate of 22.25 percent.

Under his approach, this rate would be applicable to the real property improvements and to the personal property (the value of the latter being set at the assessor's figure) but, since land does not depreciate,

the 8 percent for this purpose included in the overall capitalization rate would not be applicable to ascertain the value of the land. Following the assumption (also made by the plaintiffs' witness) that the Forest Service annual fees reflect economic rent, and assuming that an investor would follow the same 70 percent-30 percent debt-equity ratio on the land as on the other property, the capitalization rate to be applied to the land would be 11.95 percent plus 2.3 percent (for taxes), a total of 14.25 percent. Since he found the economic rent to be equivalent to 2 percent of the gross income ($571,238 x 2 percent = $11,425), the witness obtained the fair market value of the land as of January 1, 1970, by capitalizing $11,425 at 14.25 percent, giving an indicated value of $80,175, which he rounded to $80,000. The real property improvements were then valued at $869,000, for a total of $949,000.

Using the same formulas for the assessment date of January 1, 1971, he found the true cash value of the land to be $116,000 and of the real property improvements $1,264,000, for a total of $1,380,000.

Plaintiffs' expert appraiser was an impressive witness and much of his testimony has been used by the court in reaching its decision. However, several novel aspects of his income approach are conclusions based solely upon his own authority, unsupported by evidence of studies which can be duplicated and relied upon by a county assessor. Since the case requires the determination of true cash values as of the assessment dates for the purposes of local property taxation, the court cannot espouse a method unavailable to local taxing officials. (This is no criticism of the witness' method when used for the benefit of his clients who are considering investment and development of ski

area projects.) For example, the witness' projection of the income flow in future years and determination of the year in which it reaches maturation was admittedly a matter of personal judgment and the basis for his formula was not clearly revealed. A disciple would be unable to duplicate the work of the master. The same can be said for the witness' "seven percent factor" which he used in lieu of recapture of depreciable property and obsolescence, coupled with his theory that the project should be conceived as producing income in perpetuity. The witness' concept of the equity-debt ratio as being one-to-one appeared not to be borne out by the facts or by the insubstantial statistical data used by him. The witness' concept of the place of working capital in the income approach may have been based upon a misinterpretation of the California regulation relating to the return on working capital. (The court agrees with a witness of the defendant that there is no risk involved in employing working cash capital and it should not be accorded more return than the cost for which it was necessary to pay a lender to obtain the loan thereof.) The witness' treatment of each of these items in his income approach substantially affected his result, and the court, therefore, finds it unacceptable.

The defendant's expert appraiser was much more conventional in his income approach and the court concludes that, with some modifications, it can be utilized. Reference is made to Defendant's Exhibit A, Defendant's Appraisal Report, at 5-12, inclusive. For each of the subject years in question, all of the items of income and deductions necessary to the income approach should be used, as found in the appraisal report, except that as to the amounts for each item, for each year, defendant should use the data for plaintiffs'

fiscal year ending prior to the assessment date for determination of the adjusted net operating income (adjusted further for underpayment of management in the tax years involved). The use of the prior fiscal year will avoid the use of hindsight or speculation as to operation after the assessment date and will use only data which would be available to the county assessor. Since the operating period in the calendar year following the end of the fiscal year, July 31, is relatively brief, there will be less distortion of result. The only other alternative is the annualization of income and this, too, holds its dangers of distortion.

In order to determine the capital rate, the court approves the recapture of real property improvements on the basis of 15-year remaining economic life and of personal property on the basis of five years of remaining economic life. Some further studies should be made to determine whether the witness' assumption that the allocation of property values should be 10 percent for personal property and 90 percent for real property and the best founded conclusions should be utilized. The court approves the witness' determination that the return on indebtedness should be 8.5 percent but, in consideration of the highly speculative nature of the operation of the ski area, as set out above, the court deems the proper rate of return on the investor's equity to be 25 percent as of this time. See *Mt. Hood Meadows, Oreg., Ltd., supra.* (The fact that no ski area can be shown to have returned income to the investor at this rate at this time is of no significance; the industry has not matured and the investor who is not a ski enthusiast can justify such a rate, in the opinion of the court.)

The defendant's method of determining the value

of the leased property is approved; that is, the rentals paid are deemed to be economic rentals which can be capitalized at the approved rate, less the recapture rate for wasting assets.

By this decision, the cause is remanded to the defendant to make the necessary computations and to submit to the court and to the plaintiffs its schedules, prepared in accordance with the court's determination of the requirements as set out above. The parties shall attempt to agree on such a computation of true cash value for each of the years in question, but if they are unable to do so, the plaintiffs may serve and file a computation believed to be in accord with the court's decision. The court may then require briefs or oral argument before deciding on the proper computation and prior to the issuance of its decree.